Justice Hoffman had to leave, and I do want to announce for the record and for your information, Counsel, that he is a fully participating member of this Court and will be fully participating in the decision on this matter and will have the benefit of all of your oral arguments because they are being recorded. So, with that being said, Counsel may proceed. How was Ottawa this morning? It was beautiful. It obviously is. It was a nice drive out there, and I truly appreciate your letting me change the order, I guess. For future reference, there were no comp cases heard in Ottawa. There were not. I learned that from Chicago and Springfield only. And generally, Ottawa only hears third district cases. I had been out there on a case last year, and we got this letter, and it was from the Ottawa office. That's because the presiding judge and the deputy clerk for our court is in Ottawa. That's the reason why. And I appreciate your understanding and my misunderstanding. Very good. You may proceed. Thank you. What we have is at least a plaintiff's position. Two main questions. One, which was determined by the arbitrator in favor of Mr. Mansell. Another, which was ruled against Mr. Mansell. The first was, was there any exposure to a hazardous chemical as defined under the Occupational Disease Act? The arbitrator determined that based on what the Act states and the Freeman case, that any exposure to a chemical, whether, you know, how short or long or how much exposure, if there is a known hazard with working with that chemical, then exposure is determined to be, if he was exposed to any of those chemicals, the exposure is found in favor of the petitioner. But I'm a little confused. You're saying if somebody is exposed to hazardous chemicals, he automatically wins the case? No, no, no, Your Honor. He showed that exposure, that he was in fact exposed under the Occupational Disease Act. I don't think anybody disputes that in this case. Do you think that he was exposed? Whether or not it caused the condition of ill-being is what the case turns to. Right. Well, the defendant argues that the arbitrator was incorrect in his application of Freeman and that there was no proof of how much exposure there actually was. Is there any definitive proof in this case as to how much exposure there actually was? There is not any definitive proof to how much part of it was. There's no objective way of measuring it, correct? Correct. After this exposure, there was a complaint to OSHA. OSHA came in and ran some tests to determine that there was, in fact, methylene fluoride. The plaintiff testified that he handled it. Well, let's not leave that hanging in the air because I believe, just because we'll get into it, OSHA did test, as you alluded to, and according to record, they found, or your claimant also acknowledged, OSHA found the levels of the substance was within what OSHA considers safe exposure. Is that correct? It was above the what's called actionable level, which was 12.5 parts per million, but below the long-term. OSHA regulations. Correct. But there was exposure. The plaintiff testified, in fact, that he was exposed to a number of chemicals and that at least one doctor, Dr. Orris, testified that that exposure was a cause of his current liver condition. The conclusion of this case is going to turn out, okay? You clearly have an opinion from a Dr. Orris in favor of the claimant. Correct. However, the commission found there were some very significant flaws in his opinion, which I think are significant I'd like you to address. Yes. First and foremost, Dr. Orris' information about claimant's length of employment was obviously way off. He had the claimant working and being exposed for 19 years, and when, in fact, it's clear that the claimant worked for the respondent for only 10 years. Is that correct? Correct. He testified for 10 years. So where did this nine-year discrepancy come in? That I'm not sure is either an incorrect history or an incorrect statement by the doctor. The commission also said Dr. Orris' inaccurate occupational history caused him to question the basis for his opinion. He testified that the causes of claimant's liver abnormalities, which were multifactorial, admittedly, was one of the causes being the exposure to the hydrocarbons, as you're alleging. Dr. Orris reached this conclusion based on his belief that the claimant left the job in spring 2003 and that his finding by October of 2003, the problems had resolved, claimant's liver had been reduced. Then we find out that his finding claimant's liver symptoms had been resolved was inaccurate. Claimant, in fact, sought treatment for multiple positions between August 21 and June 2010, and during this time he had a number of tests, blood work due to his complaints of liver and abdominal problems, and yet Orris thought they had resolved years before. How do you explain that? Right. I think Orris' opinion was based partially on that history, first of all, that he was released in 2003, and shortly after the CT scans showed that the fatty infiltration into the liver had subsided. I think there was the commissioner pointed to one CT scan in 2005 that showed that there was more fatty infiltration in the liver than the 2003 one, and it seems a lot of weight on that, saying that Dr. Orris' opinions are, I don't want to say incorrect, but, you know, based on the fact that he saw something in 2003 that showed the lessening of fatty liver infiltration. Yeah, but here's the problem. It undermines the basis for the opinion at least to this extent. The doctor says his problems have been resolved on this date, but this is the doctor's opinion that the exposure at the workplace was causing the man's problems. He then says it's resolved, and yet four years later he's still having these problems. It undermines his opinion, doesn't it? Well, I think I... He's not being exposed for four years to these chemicals. Right. I don't know that he said it was resolved. I believe he said it was resolving. The objective findings on the CT scans show that they were resolving in 2003. In 2005 they showed that there was still some of the fatty liver, but I don't think he ever said it resolved by 2003. I think he said it was resolving. And by 2008, when plaintiffs saw Dr. Muscarello and Dr. Joshi, there was absolutely no signs. And then by the time he saw Dr. Horace personally in 2010, he was completely asymptomatic, no signs. But I think Dr. Horace testified that, granted, he did rely on the history that was given to him, which was incorrect, but he also relied on all the medical records that he reviewed and testified to all the medical records he reviewed, which would include that 2005 CT scan that showed that, you know, some of those effects of the liver were actually still there in 2005, but also based on his extensive education and experience. He has a Harvard undergrad, Yale master's degree. He has a doctorate and board certified. He testified based not just on the history. I think we all know that history is a very important factor in determining generally causation or diagnosis, but there are other factors. Again, looking at all the medical records, this doctor actually reviewed everything and he testified that this chemical exposure was, in fact, a causative factor of the liver disease. You know, he said diabetes may have caused it too. However, the petitioner was never diagnosed with any liver issues before he started working. Was he diagnosed with diabetes before? He was not. He was not diagnosed with diabetes. He had no history of diabetes, no family history of diabetes, liver disease, no history. Did he end up being diagnosed with diabetes? He did. He did. The doctor can't say that the diabetes was caused necessarily by the chemical exposure, but the diabetes and the chemical exposure, he testified, were both causes of the fatty liver infiltration. The NASH that he, or the non-alcoholic, if I have a second, the non-alcoholic steatohepatitis, if I'm saying this correctly, which is basically inflammation of the liver caused by the infiltration of fat, there's no evidence to contradict that this chemical exposure was not a causative factor. Well, but you don't, you'd have to prove this claim if you prove any other claim. Right. You can't say, as I said initially, he was exposed to this at some point at some levels, which, albeit, you'd have to concede according to the testimony within OSHA standards, when they did the testing at least. So we can't fill in the gaps, can we, in the evidence? No, but that's where Dr. Borges' testimony, although, again, based on a slightly incorrect history, is also based on his review of all the medical records, which would include any testing done after this 2003 visit, where, in October, where it showed that the liver was recovering after being outside of exposure to the doctor for a few months. However, doctor, or the plaintiff, actually testified, and the medical records show that, subjectively, he said he was almost 100 percent better after being outside of the exposure for only a month and a half. He ended his... This is the claimant? This is the claimant, right. Okay, so he's almost 100 percent better, and then he ends up, years later, he's still being treated. Wouldn't that indicate that the chemical exposure wasn't the source of his problem? Well, no, I would disagree with that, based on, you know, the infiltration in the liver. Yeah, but he said he felt 100 percent better. And that did, that he was feeling better, yes, from the being outside of the exposure. So, leaves the employment, no exposure for four years, problems four years later, it doesn't undermine his case at all? I would say no, and, again, I would point to Dr. Orris, Dr. Joshi, Dr. Muscarella, both Dr. Joshi and Dr. Muscarella. While they couldn't definitively state these chemicals were a causative factor, they felt confident enough not to send them back to that ward, because any exposure would... Why is he having problems? I guess, let me make you a very blunt question. Why is he having problems four years later, when he has no exposure to the chemicals, and he said he was feeling 100 percent better a month later? Right. So what's causing his problems? It's plaintiff's position that it's because of the continued long-term exposure before. Objectively, what it caused, the damage to the liver, his subjective symptoms might wax and wane for a little bit, but, eventually, everything went away by 2008. There was no other... He had no other issues before he started working with these chemicals. He worked 40 hours a day, or 40 hours a week, at least, handling these chemicals, which, at least handling chloride, the chemical that OSHA tested, in OSHA's documentation says it has the potential to cause, amongst other things, liver damage. We have a board-certified Harvard and Yale graduate who has basically 30 years' experience in public health handling these kind of chemical exposures, and he has literature. He had literature from... Never mind where it came from. What does it say? Right. It says that these chemicals can cause liver damage. That it is a possibility that they will cause liver damage?  Could. Could. And what do we have here to establish that the liver problems your client has experienced was caused by that exposure? We have one, Dr. Orr's testimony. Two, a chain of events showing that there was no issues from before this. And what were the symptoms? I mean, all of this stuff is highly invasive diagnostic testing. So ultimately, it started as right pain. Right pain. Right. So he, after he started feeling pain, he went to his supervisor. He at least had thought that these chemical exposures might be causing it, so he went to his supervisor and said, you know, I can't work with these chemicals. I'm going to see a doctor. That was the last time he worked, and these doctors did not want him to go back to working with these chemicals. So what do we have that's either, I mean, obviously he has a symptom that developed while he was working. What links that symptom to his work? The exposure to the chemicals in the testimony of Dr. Orr's. No, I mean, you're obviously saying it's exposure, but what links him? What links him? What is his condition that he's experiencing to the work? The doctor, Dr. Orr's testifying that this exposure to these chemicals from work that he handled every day caused or was a causative factor of the flank pain. Assume that the commission doesn't believe Dr. Orr's, which they didn't. Is there anything else in the record that establishes a causal connection? Well, circumstantially, again, Dr. Joshi, Dr. Muscarella testified. Both of them said they couldn't opine. Right. Both of them also said that they did not want him to go back to that work because exposure. We understand that, but they both said they couldn't opine that there's a causal connection. Right. So if the commission disbelieves Orr's, then, of course, there is no opinion contained within the record that establishes causation. And in this particular case, the commission didn't find or the arbitrator didn't find there was no causal connection. The arbitrator found you failed to prove it. I mean, in this case, there's something a little bit unusual. We get these all the time, as you know. There's conflicting medical evidence, and sometimes we question the commission's finding. They had very specific reasons why they didn't believe him. He had him exposed almost double to what the actual exposure was in terms of years, and he had the problem completely resolving itself, which would indicate when he stopped going to work, it should have been okay. And years later, he still has problems. So, I mean, they documented reasons why they rejected his opinion. Right. The exposure of 19 years, while, yes, it is almost double, the doctor doesn't state that he puts most of the weight of his opinion on the fact that he was exposed for that long. Yeah, but he maintains that's what he was told. That's what he based it on, the 19 years. And that's part of his opinion. The rest of his other parts of his opinion, again, are his readings of the medical records, his education, his knowledge, and the fact that despite there being some objective findings of the liver after 2003 and 2005, the plaintiff's complaints were not anywhere near what they were at the time he was working, nor in the, you know, short time after he had left. Did the objective findings on the CT scan just show a little bit of this fatty liver infiltration? Counsel, your time is up. You'll have time, five minutes to reply. Thank you. Counsel, you may respond. If it pleases the court, counsel, Martin Trande for the respondent, Murphy Chemical. As was pointed out in counsel's argument, the commission went to some length by pages of single-spaced statements of facts, three single-spaced pages with regard to the causal connection issue. Who prepared that? Pardon? Who prepared that? The arbitrator's decision? Yeah, arbitrator or one of the lawyers? Quite frankly, Your Honor, I don't know. I guess one of the lawyers. I didn't try the case. Because it's so prolix that the arbitrator probably wouldn't have had time to do it. And I don't disagree. From my point of view, I don't need it much shorter. And here's why. Well, here, let's make it real easy. Or is his opinion's outcome determinative? Is it not? If they accept it, he recovers. If they reject it, he loses. There are no other opinions out there. If Your Honor is presenting either or? I just gave you a softball. You want to hit it out of the park? Correct. Okay. But as I said, I don't know that the commission had to go to such length. But it did. It did. And it rejected Oris. And once Oris's opinion is rejected, there is no opinion in the record. And the commission decided it on the failure of proof. Correct. And the commission has to reject Oris or to give his opinion less weight than the cumulative weight of Drs. Joseph and Muscarella. And the fact that there was no opinion from Dr. Van Thiel or this Dr. Gabon who founded the gastroesophageal reflux, Dr. Oyama was involved, too. He said his condition is of unspecified etiology. Dr. Muscarella initially said his condition, the fatty liver, could be purely a phenomenon of exogenous obesity, but he couldn't rule out this cause. That's not exactly the causal connection. But, in fact, Dr. Joseph said that the etiology was obscure, was unclear. But you want to be careful of gilding it a little too much. I know you have a client to represent, but I think he just summarized your case. Oh, no. All I'm saying is the commission actually should have just looked at this evidence as opposed to Dr. Oris and decided that the way the evidence was that there was no causal connection. Well, maybe they've been hearing from us in many cases the approach that we take now is give us some reasons. Don't just say a conclusion. Document some factual findings. And here they did. So you should be happy with this. Well, I'm certainly not unhappy as I stand before the Court. But all I'm saying, I suspect I would have taken a little bit, if I were not a trade with the commissioner, I would have taken a little bit more of a bare bones approach with the knowledge and understanding of what the Court would like us to find. Well, you could snatch defeat out of the joys of victory if you continue. Well, we have no intentions of doing that. All I can say is. Let's make it real easy. Instead of making everything so overly complicated. The commission said the question then becomes whether petition approved by preponderance of the credible evidence that a causal relationship exists between said exposure and the claimed occupational disease. Then they go on to say, after they go through Oris' opinion, however, Oris' opinion in this regard appears to be based in accurate history involving a cessation of workplace exposure. Thus, it would appear that Dr. Oris' attempt to relate petitioner's liver condition to the workplace exposure by pointing to the resolution of the findings immediately after removal from the source hazard is misplaced. Therefore, based upon the above, arbitrator finds petitioner failed to prove. So. Agreed. Did they have a right to reject Oris' opinion? Yes. If so, why? They did because, not merely because of the manner in which they debunked Oris, but because there were the treating physicians. None of them could find a causal connection. They couldn't place weight on that. That's all I'm trying to say. And one other thing on the legal issues. My client and I believe that the commission's emphasis on Freeman was misplaced because Freeman was a new. Well, I think it's important that. To whom? To whom? To whom? Well, I guess at this point, Your Honor, it's not important at all. But we do reject the idea that merely because there was an exposure, there's an ipso facto, there's a. I think we've established. A connection. They ended by saying, instead, the arbitrator views this matter simply as a failure of proof, in that the only opinion offered in support of a finding of causation in this matter, Dr. Oris, was based on a significantly misunderstanding as to the duration and cessation of the workplace exposure. Accordingly, petitioner's claim for compensation is denied. No, no disagreement. Just one last point. Since we cited Sorensen here, I argued Sorensen. I'm surprised to see it was 21 years ago. And they only had one doctor's opinion. And the court did not accept Dr. Burnett. Here, we have many doctors saying no causal connection. No, no. The doctors didn't say no causal connection. Don't say that. They said we cannot relate it. We cannot relate it. And we cannot say that it is. They never said it wasn't. No disagreement, Your Honor. But again, that's not a causal connection. Thank you. Thank you, counsel. Counsel may reply. Just briefly, I think, again, while arbitrators are not required to take the testimony of Dr. Oris as gospel, you know, there is plenty of arguments that his opinion isn't solely based on this incorrect history. Again, he saw the plaintiff on two occasions. He reviewed medical from shortly after the time of his last appointment in August of 2001 up until 2008. And again, he's basing this on his knowledge and understanding of the public health issues with these chemicals, as well as what the diagnoses were, the symptoms, the progression after the lapse of exposure to the chemicals, mainly the methylene chloride, which, again, was testified that he handled it 40 hours a day for 40 hours a week for 10 years. And while, again, Dr. Joshi and Dr. Moscarella do not state that they can relate the liver issues to these chemicals, again, the plaintiff feels that circumstantially their refusal of allowing him to return to this type of work. Well, maybe that's just good medical practice, too, isn't it?  But I think it does show that they at least had a concern. Correct. You know, for the reasons stated, the plaintiff asked that this court uphold the commissioner's decision that there was exposure under the act and reverse the finding that the plaintiff failed to prove that there was a call for action by the Congress of the evidence as it is against the manifesto evidence. Thank you. Thank you, counsel. Thank you, counsel, both, for your arguments. This matter will be taken under advisement. Bidding disposition shall issue.